[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
By petitions filed on September 6, 1989, the Commissioner of the Department of Children and Youth Services (DCYS) seeks to terminate the rights of Jacqueline F. and William N. in and to their child William N., Jr., and the parental rights of Jacqueline F. in and to her child Damien F. The father of Damien is unknown. The two petitions have been brought pursuant to Gen. State 17-43a, whereby the court has jurisdiction with respect to any child previously committed to DCYS in accordance with Gen. Stat. 46b-129
(d). Both children were found to be uncared for on August 25, 1987 and, on that date, were committed to DCYS for eighteen months. The commitments were extended for an additional eighteen months on June 26, 1990 and are presently in effect. When the petitions were filed Damien was nine years old and William was eight.
Each petition alleges the existence for a period of not less than one year of the following statutory grounds:
 (1) Abandonment by the parent, in the case of Damien, and by the parents, with respect to William, in the sense that she and they failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare.
 (2) Failure to have achieved a degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the ages and needs of the respective children, they or, in Damien's case, she could assume a responsible position in the life of such child. CT Page 2385
 (3) Acts of commission or omission resulting in a denial to such child of the care, guidance or control necessary to his physical, educational, moral or emotional well-being.
Before proceeding to the merits of the DCYS allegations, mention should be made of the structure of a termination proceeding. A petition to terminate parental rights consists of two phases, adjudicatory and dispositive. Practice Book 1042, 1044, 1049. The two phases, however, do not have to be the subjects of separate hearings. One unified trial, such as occurred in these cases is permissible. In re Juvenile Appeal (84-AB), 192 Conn. 254, 259 (1984).
Although the procedure of one trial is sanctioned, the two phases serve distinctive purposes. In the adjudicatory phase, the court determines the validity of the grounds alleged and, hence, is limited to events antedating the filing of the petitions on September 6, 1989. The dispositive phase is concerned with what action should be taken in the best interest of the child and, as to that phase, the court is entitled to extend its consideration to matters occurring until the end of the trial which, in these cases, was August 7, 1990. In re Juvenile Appeal (84-AB), supra at 267-68, n. 14. The dispositive phase is not reached unless at least one of the grounds alleged in the petition is proven by clear and convincing evidence. Gen. Stat. 17-43a(b); In re Migdalia M., 6 Conn. App. 194, 208, cert. denied, 199 Conn. 809
(1986).
 II.
At the trial, the court received testimony from Rita Gerby and Linda Foster, social workers at the Child Guidance Clinic of Waterbury, Dr. David Mantell, a psychologist, Clara Tilton, the children's foster mother, Marion Fontanella, program director at Coordinated Crisis Center in Meriden, and Carolee Earle, the DCYS social worker assigned to these cases. Also placed in evidence were Dr. Mantell's report, the mandated social study and other reports prepared by Ms. Earle, as well as several service agreements entered into by DCYS and one or both parents. Neither parent appeared at the trial which took place on July 31 in New Haven and on August 7 in Meriden. The parents, however, were represented by separate appointed attorneys.
From the testimonial and documentary evidence, the court finds the facts set forth to be relevant and material to the adjudicatory phase of both petitions.
Jacqueline F. and William N. have never married although they CT Page 2386 have had three children, William, Jr., the subject of one of the petitions, and two younger children, Denise and Alan. William N., although not legally related to Damien, has regarded him as a member of his family.
The two boys, Damien and William, Jr., came to the attention of DYCS through a referral from the police department. William N. had alleged that the boys had been sexually abused. The charge proved to be unsubstantiated but an outreach social worker was provided through the Child Guidance Clinic of Meriden. In August of 1986, Damien and William, Jr. were placed in foster care for a short period. In March of 1987, they were placed in foster care again at the request of Jacqueline and, as noted, they were committed on August 25, 1987. Following the commitment, the two boys were continued in the same foster home where they presently reside.
On the date of the commitment and thereafter, DCYS' goal was to reunify the children with Jacqueline who, over the years, has maintained a "live together" "live separately" relationship with William N. Both parents were aware of DCYS' goal and semi-annual treatment plan reviews and yearly service agreements were geared toward its accomplishment.
In the service agreements dated March 25, 1987, July 12, 1988 and January 10, 1989, Jacqueline obligated herself to visit Damien and William, Jr. regularly and consistently. The 1988 agreement mentions every other week. In the 1987 agreement, Jacqueline allowed Damien and William, Jr. to be evaluated and to receive therapy and agreed to attend therapy herself. In the 1988 agreement, she again agreed to participate as recommended by the therapist and agreed to participate in joint counseling sessions with the Waterbury Child Guidance Clinic as requested. The 1989 agreement, which was signed by both Jacquline and William N, obligated her to participate in counseling consistently as recommended by the therapist and obligated him to participate consistently in counseling at the Waterbury Child Guidance Clinic.
Both children were referred to the Child Guidance Clinic of Waterbury by their school. Damien had exhibited problems of aggression, lying and stealing, and for William Jr., the trouble was low self-esteem exacerbated by a learning disability. The clinic arranged a program whereby Rita Gerby would see Damien individually and Damien, William, Jr. and Jacqueline together. Linda Foster was the social worker assigned to William, Jr. on an individual basis. Rita Gerby scheduled eight visits for joint counseling. Jacqueline showed up for two visits, cancelled one, and did not appear for five, even though the Child Guidance Clinic and DCYS had arranged for transportation from Meriden to Waterbury. Damien was upset by his mother's absences. CT Page 2387
In June, 1989, Damien's individual counseling was discontinued due to his improvement. William, Jr., however, continued under Ms. Foster's care. Neither Jacqueline nor William N., despite his promise in the service agreement of January 10, 1989, ever contacted Ms. Foster.
Contact, in general, between Jacqueline and William N. and the two boys has always been a problem. From 1987 through 1989, the parents had unsupervised visits. Jacqueline visited three times in 1987, six times in 1988, and twice in 1989. In 1990, there was one supervised visit. Some of the visits were in Meriden with the children having been brought by the foster mother. Jacqueline's visits were far less than contemplated by the service agreements although she was driven or offered compensation by DCYS for travel to the foster home in Oxford. William's visits' amounted to one in 1987, no visits in 1988, and one in 1989 which was a trip to Lake Quassapaug. He had one supervised visit in 1990.
Both parents knew the telephone number for the foster home. Jacqueline has not called since the end of 1987. William called once, in 1989, from his parents' home in Florida. His call was before the time he took the boys to Lake Quassapaug.
In the spring of 1988, the DCYS social worker referred Jacqueline to Coordinated Crisis Center in Meriden, an agency that provides outreach social workers and parent aides. The DCYS social worker and the outreach social worker made a joint visit to Jacqueline's apartment, which visit resulted in the service agreement of June 12, 1988 in which Jacqueline agreed to accept an outreach social worker or a parent aide during visits with the children every other week. Two vis its occurred in July, 1988, but Jacqueline was not at home for visits in August. After August, 1988, Jacqueline continued to be ambivalent as to whether she wanted an outreach worker or a parent aide. On October 20, 1988, Jacqueline decided that she did not want the services of the Coordinated Crisis Center.
On January 24, 1990, the parents and children were evaluated by Dr. Mantell. The examinations consisted of individual interviews and testing of the parents and the same procedures were followed with Damien and William, Jr. After the individual examinations, there was a 2-3/4 hour interaction session at which the parents, children, younger siblings and the foster mother were present. Although occurring after the filing of the petitions, the substance of Dr. Mantell's evaluations was relevant, in many respects, to the adjudicatory issues.
In their respective interviews, Jacqueline and William CT Page 2388 detailed their relationship. Both parents acknowledged that living apart enabled them to get along better. In the interaction session, the children responded more appropriately to the foster mother, whom they referred to as "Mom," than they did to either parent. Dr. Mantell found the father to be immature, unsettled and unprepared for the responsibility of parenthood. He found the mother to be able to function as the caretaker for the younger siblings but that she was not able to relate satisfactorily to Damien and William, Jr. when given an opportunity to do so. The parents, and the children as well, appeared to have idealized their relationship. For example, William informed Dr. Mantell that he saw the boys with regularity and Jacqueline reported that she saw them for three hours every two weeks under the supervision of the foster parents. As mentioned earlier, the facts of these cases are quite different. Damien was reserved throughout the interaction session although he hugged William and Jacqueline at the beginning and end. William, Jr. tried attention-getting behavior directed primarily at Jacqueline and clung to her when the session was over.
According to Dr. Mantell, the immaturity and under responsibility of both parents are "characterological" problems that are well established and unlikely to change over time. He found that on January 24, 1990, and hence, by implication on September 6, 1989, the children still hoped to be reunited with William and Jacqueline.
 III.
Clear and convincing evidence, the statutory burden of proof in termination cases, has been described quantitatively and qualitatively. In terms of quantity, clear and convincing evidence is a level of persuasion lying between the usual civil requirement of proof by a fair preponderance of the evidence and the requirement in criminal cases of proof beyond a reasonable doubt. Cookson v. Cookson, 201 Conn. 229, 234 (1986). Another and more qualitative definition is that clear and convincing evidence is proof sufficient to satisfy a court beyond an average certainty. In re Juvenile Appeal (84-3), 1 Conn. App. 463, 468, cert. denied, 193 Conn. 802 (1984).
 A.
Abandonment, the first ground asserted by DCYS, is defined by 17-43a(b)(1) as a parent's failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of [his or her] child." The statutory definition differs from the common law concept of abandonment wherein an intent to abandon totally and permanently must be proved. Litvaitis v. Litvaitis,162 Conn. 540, 547 (1972); Kantor v. Bloom, 90 Conn. 210, 213
CT Page 2389 (1916).
In In re Rayna M., 13 Conn. App. 23, 36-37 (1987), the Appellate Court discussed statutory abandonment in the context of parental responsibilities set forth in an earlier decision of the Supreme Court. In In re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 15 (1981), the Supreme Court stated that the commonly understood obligations of parenthood entailed the following minimum attributes: (1) expressions of love and affection for the child; (2) expressions of personal concern over the health, education and general welfare of the child; (3) a duty to supply the necessary food, clothing and medical care; (4) a duty to provide an adequate domicile; and (5) a duty to furnish social and religious guidance. The extent to which specific parents should be held to the performance of all or some of these obligations depends in large part on the particulars of a given case. Consideration must be given to the facts that the children have been out of Jacqueline's day-to-day care since March, 1987 and that William has never really been a custodial parent. The verb "maintain", as used in 17-43a(b)(1), however, contemplates that a parent will continue to have a reasonable degree of interest in the welfare of his or her children. In re Migdalia M., supra at 210.
Statutory abandonment forces on a parent's conduct and presents a question of fact. In re Juvenile Appeal (Docket No. 9489), supra at 14. The court's findings of fact present clear and convincing evidence that statutory abandonment has occurred. The paucity of visits by Jacqueline and William coupled with an absence of telephone calls to the children and their unexplained refusals to partake of the parent-child counseling offered by the Waterbury Child Guidance Clinic, amounted to a lack of a reasonable degree of interest, on the part of either of them, in the welfare of the children.
The second ground asserted for termination is that after the uncared-for adjudications on August 25, 1987, Jacqueline and William "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the child[ren], they could assume a responsible position in the [lives of their children]." Gen. Stat. 17-43a(b)(2). The phrase "`personal rehabilitation', as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Rayna M., supra at 32; In re Migdalia M., supra at 203.
What is a reasonable time is invariably a question of fact to be governed by attendant circumstances. From March of 1987, when the children were voluntarily placed in foster care by Jacqueline, both she and William effectively withdrew from any responsible CT Page 2390 role in the children's lives and neither of them made any effort to resume such a role. There was a precipitous decline in visits, on Jacqueline's part, from 1988 to 1989 and William visited only twice with the children. Their respective failures to abide by the terms of the post-commitment service agreements, pertaining to counseling and visitation, while in itself not synonymous with a failure to achieve personal rehabilitation, see In re Migdalia M., supra at 206, does provide cogent evidence of an inability or unwillingness to change the situation.
Moreover, Dr. Mantell, in his evaluations of January 24, 1990, found that the immaturity and under-responsibility of Jacqueline and William were well-established problems. Mantell's assessments, therefore, can be used circumstantially to determine what the parents were like on September 6, 1989 when the petitions were filed. Hennessey v. Hennessey, 145 Conn. 211, 214-15 (1958).
What became apparent at the trial was that there had been no change in the disability of either Jacqueline or William to serve effectively as a parent for Damien and William, Jr. As with the preceding ground of abandonment, the court's factual findings establish clearly and convincingly that personal rehabilitation had not been achieved by Jacqueline or William N. and that both grounds were in existence for a period of not less than one year. Gen. Stat. 17-43a(b).
On the third ground claimed for termination, the statutory requirements are that, by reason of an act or acts of parental commission or omission, a child has been denied the care, custody or control necessary for his physical, educational, moral or emotional well-being. The difficulty in applying this ground to noncustodial parents was noted in In re Luke G., 40 Conn. Sup. 316,324 (1985).
Certainly both children have had psychological problems. But the reference to the Child Guidance Clinic in Waterbury came after placement in foster care and from their school. Since reunification was the goal, attendance and participation by one or both parents was desirable. To relate the children's problems to acts of commission or omission by the parents, however, requires a resort to conjecture. Consequently, the court regards the third ground as non-proven.
 IV.
Having found that the first and second grounds were established, the court may proceed with the dispositive phase. Proof of one or more of the statutory grounds does not bring forth orders of termination automatically. To warrant a destruction of the parent-child relationship, the court must also find from clear CT Page 2391 and convincing evidence that a termination of parental rights is in the best interest of the child. In re Nicolina T., 9 Conn. App. 598,602 cert. denied, 203 Conn. 804 (1987). By the express language of 17-43a(d), the court cannot reach this ultimate best interest conclusion until it has considered and made written findings on the six factors enumerated therein.
Set forth below are the written findings on the six factors of August 7, 1990, the date on which the trial ended.
(1) When the children were placed in foster care in March, 1987, DCYS attempted to arrange a regular system of visits between Jacqueline and the children which included offers of reimbursement for Jacqueline's travel expenses. These efforts continued after the commitments on August 25, 1987, as evidenced by the service agreements. DCYS also arranged for Jacqueline's transportation from Meriden to Waterbury for sessions at the Child Guidance Clinic. In addition, DCYS referred Jacqueline to the Coordinated Crisis Center in Meriden for the services of an outreach social worker or parent aide and actively tried to put such a program into place. DCYS did not seek out William N. after the commitments. William, however, was aware that the agency's goal was to reunify the children with their mother and that there was no restriction on his visits or in writing or making telephone calls to the children. In January, 1989, DCYS arranged for William N. to participate in counseling at the Child Guidance Clinic of Waterbury.
(2) Following the filing of the petitions, there was a court order on December 12, 1990 for psychological evaluations of the parents and a parent-child evaluation. The parents complied with the court's order.
(3) Both Damien and William, Jr. have feelings for and emotional ties with Jacqueline, and to a lesser extent with William, although they have despaired at the likelihood of reunification and are unconvinced of the interest of Jacqueline and William in them. The children are bonded to their foster parents with whom they have lived since March, 1987 and view the foster parents as their psychological parents.
(4) When the trial ended, Damien was 9 1/2 years old and William Jr. was 8 1/2 years old.
(5) The court has not met Jacqueline or William but accepting Jacqueline's statement to Dr. Mantell, she now has an apartment where Damien and William, m, Jr. could be housed. In psychological terms, however, neither William nor Jacqueline has made an effort to adjust their circumstances, conduct or conditions to make it in the best interest of either child to return him to Jacqueline's CT Page 2392 home in the forseeable future.
(6) Neither parent was prevented by DCYS or by anyone else from maintaining a meaningful relationship with the children. The financial circumstances of the parents, apparently a factor when the children were placed in foster care, was alleviated through the offers of DCYS of payment or transportation expenses and participation in parent-child counseling.
Dr. Mantell, whose professional opinion is entitled to great weight in termination proceedings, In re Juvenile Appeal (Anonymous), 177 Conn. 648, 677 (1979), favors maintaining the children in their present foster home either as a foster or as an adoptive home. The court, upon consideration of all of the evidence, agrees. Where warranted, parental rights can and should be terminated even when an adoption is not contemplated. In re Theresa S., 196 Conn. 18, 31 (1985); In re Rebecca W., 8 Conn. App. 92,94-95 (1986). The alternative, also mentioned by Dr. Mantell, would be to return the children to Jacqueline with whatever counseling supports and in-home aides as might be advisable and acceptable to her. In the court's opinion, this alternative is unacceptable in view of Jacqueline's rejection of services previously offered.
At the trial, the foster mother testified that she and her husband would like to adopt Damien and William, Jr. The adoption would provide the children with permanency in planning and a stable and loving home. "Petitions for termination are presumably seldom brought unless prospective adoptive parents are available." In re Juvenile Appeal (Anonymous), supra at 673.
In determining that the granting of these petitions is in the best interest of the children, the court has taken into account all of the defaults of Jacqueline and William, including their unexplained absences from the trial.[1] See In re Bobby Jo S.,10 Conn. App. 36, 41 (1987).
 V.
A termination of the parental rights of Jacqueline F. in and to her minor child Damien F. is ordered. And a termination of the parental rights of Jacqueline F. and William N. in and to their minor child William N., Jr. is also ordered.
Pursuant to Gen. Stat. 17-43a(f), it is further ordered that the Commissioner of DCYS is appointed as statutory parent for both children so that Damien and William, Jr. can be placed in adoption. DCYS is required to submit reports to the clerk of the court within ninety days of the date of these judgments and every six months thereafter until the adoptions are finalized. CT Page 2393
JERROLD BARNETT, JUDGE.
ENDNOTE